UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| JENNIFER GAYLE JACOBI, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 16-339-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of cross-motions for summary judgment filed by Plaintiff Jennifer Gayle Jacobi and Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration ("the Commissioner.") [Record Nos. 10, 12] Jacobi argues that the Administrative Law Judge ("ALJ") assigned to her case erred in concluding that she was not disabled within the meaning of the Social Security Act ("Act"). Specifically, she asserts that the ALJ failed to properly consider the opinion evidence and to fully consider all impairments in determining her residual functional capacity ("RFC"). Jacobi requests an award of benefits or, alternatively, that this matter be remanded for further administrative proceedings. The Commissioner contends the ALJ properly evaluated the evidence of record and that the ALJ's decision should be affirmed. She further contends that the ALJ's decision is supported by substantial evidence.

For the reasons that follow, the Commissioner's motion will be granted and the administrative decision will be affirmed. The relief sought by Jacobi will be denied.

## I.     Procedural History

On March 25, 2013, Jacobi filed a Title II application for a period of disability and disability insurance benefits, ("DIB"), alleging an onset of disability of April 22, 2011.[1] [Administrative Transcript; hereafter, "Tr." 210] After being denied initially and on reconsideration, Jacobi requested an administrative hearing. [Tr. 108, 117, 125] On February 20, 2015, Jacobi appeared before ALJ Don Paris in Lexington, Kentucky. [Tr. 7–45] ALJ Paris denied benefits in a written decision on March 17, 2015, which the Appeals Council affirmed. [Tr. 62–72, 1] The claimant has exhausted her administrative remedies and this matter is ripe for review under 42 U.S.C. § 405(g).

## II.    Background

Jacobi was fifty-three years old at the time of the ALJ's decision. She was married and had two adult daughters, one of whom lived at home. [Tr. 12] Jacobi has a high school education and took one year of vocational training in graphic art. [Tr. 13] She worked most recently in 2008 as a receptionist for the Kentucky Cabinet for Health and Family Services. [Tr. 353] She also worked for nine years as a teacher's aide in a public elementary school, and for six years as a self-employed day care operator. [Tr. 14–16, 353]

Jacobi reported being five feet, five inches tall and weighing two hundred and ten pounds. [Tr. 12] She stated that she developed right shoulder pain during her teenage years and underwent surgery in 1992. This surgery relieved the pain for a brief time. [Tr. 16–17] Jacobi advised the ALJ that she now has pain in both shoulders. *Id.* She also reported suffering

---

[1] Jacobi initially alleged an onset date of April 1, 2011 but, during the administrative hearing, she was permitted to amend the date to April 22, 2011. [Tr. 10, 210]. In the written decision, the ALJ erroneously recorded the amended onset date as February 11, 2011. [Tr. 62]

- 2 -

from pain in her hands, hips, and feet, which began in the mid–1990s. [Tr. 18] Physical therapy and chiropractic treatment were reported to have worsened the pain. [Tr. 19] Jacobi stated that she awoke frequently every night due to pain, as well as her need for a new CPAP machine. [Tr. 21] She also reported having suffered from migraine headaches her entire adult life. [Tr. 34] These headaches, which occurred once or twice per week and include visual disturbances and nausea, required her to sleep from two to ten hours. [Tr. 36–37] Jacobi stated that she lost two jobs because of missed time due to migraines. [Tr. 34]

Jacobi testified that she could "mostly" bathe independently, but that she did not do so as frequently as she had in the past. [Tr. 23] She did some light cooking, but her husband often picked up fast-food on his way home from work. *Id.* Jacobi reported that household chores often went unfinished, but that she could load the dishwasher or do a single load of laundry, sometimes with assistance. [Tr. 23–24] She used to read and paint for pleasure, but she was no longer able to hold a book or a paintbrush. [Tr. 24, 33] Her only hobbies were watching television and using Facebook. [Tr. 24, 294]

Jacobi reported being able to sit and stand for about fifteen minutes before changing positions. [Tr. 29–31] She believed she could walk for about twenty minutes without stopping and that she could bend and stoop "once or twice." [Tr. 31] She had no mental health problems before she stopped working, but after she became unemployed and increasingly ill, Jacobi claims she became more depressed. [Tr. 27] She received counseling in Danville, Kentucky, which helped, but she did not feel good enough to get ready to go. [Tr. 25]

The record contains treatment notes from Jacobi's primary care provider, Dr. Rick Angel. Dr. Angel noted in March 2008 that Jacobi complained of increased frequency of migraines and that she had tried multiple preventive medications, but without success. [Tr.

497] The claimant continued to complain of headaches with visual disturbances in February 2009. [Tr. 493] Dr. Angel remarked that a review of systems was otherwise negative and ordered an MRI of Jacobi's brain, which was normal. [Tr. 493, 502] Jacobi returned to Dr. Angel the following month, complaining of a "big flare up" of fibromyalgia. [Tr. 491] Dr. Angel prescribed Lortab and vitamin B12. The claimant was doing somewhat better by May 2009, but by June, she called Dr. Angel to report that her fibromyalgia was worse. [Tr. 489]

Jacobi returned to Dr. Angel in September 2010 and was prescribed a new fibromyalgia medication. [Tr. 485] It appears that her next visit with Dr. Angel was a little over a year later. At that time, Jacobi reported that she was "having a lot of trouble" with fibromyalgia and that she had not been able to work. [Tr. 480] It appears that, at some point during the previous year, Jacobi had discontinued the fibromyalgia medication prescribed in September 2010. *Id.* Dr. Angel prescribed a new medication for the condition and advised Jacobi to follow-up in four weeks. *Id.*

In October 2012, the claimant returned to Dr. Angel, asking for a referral to a neurologist and a rheumatologist. [Tr. 478–79] Angel diagnosed Jacobi with polyarthralgia and recorded that she had nodules in her hands. [Tr. 478] Diagnostic imaging detected soft tissue density on the radial aspect of the right second DIP joint. [Tr. 498] A subsequent laboratory test was negative for rheumatoid arthritis factor. [Tr. 508] Jacobi had a final visit with Dr. Angel in May 2014, before he joined a different practice group. Dr. Angel prescribed pain medicine and commented that Jacobi was doing "reasonably well." [Tr. 659]

Dr. Kelly Cole is the claimant's treating rheumatologist. Dr. Cole saw Jacobi for the first time in August 2013. [Tr. 540] With respect to arthralgia, Dr. Cole remarked that Jacobi had no synovitis or abnormal lab results, but did have severe pain and stiffness. [Tr. 541] She

also noted decreased range of motion of the right shoulder, and heaviness and paresthesia throughout the extremities. [Tr. 541] Cole referred Jacobi to other specialists, including a neurologist, and recommended a follow-up appointment in four months. *Id.*

When the claimant returned to Dr. Cole in August 2014, Cole commented again regarding Jacobi's joint pain and stiffness. [Tr. 630] Specifically, Cole reported that Jacobi had left knee pain, that she experienced catching, and could not straighten it completely. *Id.* However, the symptoms improved with a Medrol dose pack and Jacobi refused an injection. Accordingly, an orthopedic evaluation was deferred at that time. *Id.* An x-ray Dr. Angel had ordered a few months earlier revealed mild multicompartment osteoarthrosis of the left knee. [Tr. 650, 662]

It appears that Jacobi did not see Dr. Cole again until March 2015. [Tr. 702] At that time, Cole assessed Jacobi's medications from a rheumatologic standpoint and also agreed to take over her pain management because Dr. Angel had moved. [Tr. 703] In relation to arthralgia, Cole commented "[patient] would miss at least 2 days monthly of work related to her [symptoms]; before she stopped working, was missing 2 days/week." *Id.*

The claimant initiated psychotherapy with Gina Alexander, L.C.S.W., in March 2014. [Tr. 697] Alexander described Jacobi's attention, concentration, insight, and judgment as good. [Tr. 698] Further, Alexander believed Jacobi's memory, perception, flow of thought, and speech, were either normal or intact. *Id.* However, she described Jacobi's mood as depressed and her affect as constricted. *Id.* Alexander diagnosed Jacobi with major depressive disorder, recurrent, mild, and assigned her a Global Assessment of Functioning ("GAF") score of 75, indicating very mild limitations in functioning. *See, e.g., Covucci v. Apfel*, 31 F. App'x 909, 913 (6th Cir. 2002).

Jacobi returned for a counseling session the following week. [Tr. 699] Alexander described Jacobi's mood at that time as euthymic and reported that there was some slight improvement. The claimant was advised to return for another counseling session in two weeks. [Tr. 700] It does not appear that the claimant ever returned for another session, and she was formally discharged in February 2015. [Tr. 701]

In May 2013, Jennifer Sutherland, M.S., performed a consultative psychological examination of the claimant. [Tr. 528–32] Sutherland observed that Jacobi's energy level was adequate and that her mood and affect were appropriate. [Tr. 529] She was aware of current news events and was able to perform simple mathematical calculations. *Id.* Additionally, Jacobi was able to describe how everyday items were similar and able to interpret the meaning of a common proverb. *Id.* The claimant advised Sutherland that she had trouble concentrating and had been depressed on and off since she became sick. [Tr. 530–31]

Sutherland diagnosed Jacobi with major depressive disorder and pain disorder related to both psychological and medical conditions. [Tr. 531] She assigned Jacobi a GAF score of 60, which indicates moderate difficulty in social, occupational, or school functioning. *See, e.g., Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006). Sutherland indicated that Jacobi had a good ability to understand, retain and follow instructions, and to relate to others. [Tr. 532] She also believed that Jacobi's capacity to sustain attention to perform simple, repetitive tasks was good. *Id.* Sutherland opined, however, that Jacobi's ability to tolerate the stress and pressures associated with day–to–day working activities was fair. *Id.*

Dr. Robert Nold performed a consultative physical examination in June 2013. [Tr. 533–37] The claimant complained of migraines, fibromyalgia, high blood pressure, right

shoulder issues, anxiety, and depression. She reported that, despite trying multiple medications, nothing had helped her migraine headaches but Cymbalta had helped her fibromyalgia "somewhat." *Id.*

Dr. Nold noted that Jacobi's cervical range of motion was normal, but she reported that she could not move her neck normally when she had a migraine headache. [Tr. 534] Her extremities appeared normal, with no evidence of atrophy. However, Nold reported that the Jacobi had "trigger pressure points in her posterior shoulders and along her paraspinous areas numbering 18 trigger points that were positive consistent with her diagnosis of fibromyalgia." [Tr. 535] The claimant was able to flex and extend her knees and elbows without difficulty. Her ambulation was normal and Jacobi had full forward and lateral flexion of the lumbar spine. *Id.* She had normal grip strength, and was able to perform fine manipulation with her fingers. [Tr. 535] Her lower extremity strength was five-out-of-five, and she was able to perform a heel-toe and tandem walk, although she did demonstrate some unsteadiness during those activities. *Id.* An x–ray of Jacobi's right shoulder was normal. *Id.*

Dr. Nold opined that Jacobi's main problem seemed to be her migraine headaches, which she reported occurred up to three times per week. [Tr. 536] He noted that her shoulder appeared to be normal and that she did not have any "major problem" with her low back. Additionally, Dr. Nold commented that Jacobi's neck range of motion was normal when she was not experiencing a migraine headache. *Id.* Ultimately, he concluded that, aside from these issues, Jacobi "appears to be functionally intact." [Tr. 537]

Dr. Paul Saranga reviewed Jacobi's file on September 20, 2013. [Tr. 101–05] Dr. Saranga discussed the claimant's primary care notes and her ongoing issues with pain. [Tr. 102] He relied on Dr. Nold's examination, which indicated that Jacobi had no significant joint

problems, but commented that Jacobi was limited due to fibromyalgia and migraines. *Id.* Dr. Saranga opined that the claimant could occasionally lift and/or carry 50 pounds and could frequently lift and/or carry 25 pounds. He believed she could stand, stand and/or walk six hours in an eight hour workday. [Tr. 101] Further, she could balance, stoop, crouch, crawl, and climb ramps and stairs frequently, but could only climb ladders, ropes, or scaffolds occasionally. [Tr. 102] Dr. Saranga believed that Jacobi should avoid concentrated exposure to hazards such as machinery and heights. [Tr. 103]

After considering the entire record, the ALJ determined that Jacobi had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), which was the same RFC recommended by Dr. Saranga. [Tr. 69] The ALJ further concluded that Jacobi was capable of performing her past relevant work as a receptionist and teacher's aide. [Tr. 71] Accordingly, he determined that she had not been under a disability through March 31, 2014, the date last insured. [Tr. 72]

### III.  Standard of Review

Under the Act, a "disability" is defined as "the inability to engage in 'substantial gainful activity' because of a medically determinable physical or mental impairment of at least one year's expected duration." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007) (citing 42 U.S.C. § 423(d)(1)(A)). A claimant's Social Security disability determination is made by an ALJ in accordance with "a five-step 'sequential evaluation process.'" *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc). If the claimant satisfies the first four steps of the process, the burden shifts to the Commissioner with respect to the fifth step. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

A claimant must first demonstrate that she is not engaged in substantial gainful employment at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(c). Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months and which meets or equals a listed impairment, she will be considered disabled without regard to age, education, and work experience. 20 C.F.R. § 404.1520(d). Fourth, if the claimant has a severe impairment but the Commissioner cannot make a determination of the disability based on medical evaluations and current work activity, the Commissioner will review the claimant's RFC and relevant past work to determine whether she can perform her past work. If she can, she is not disabled. 20 C.F.R. § 404.1520(f).

Under the fifth step of the analysis, if the claimant's impairments prevent her from doing past work, the Commissioner will consider her RFC, age, education, and past work experience to determine whether she can perform other work. If she cannot perform other work, the Commissioner will find the claimant disabled. 20 C.F.R. § 404.1520(g). "The Commissioner has the burden of proof only on 'the fifth step, proving that there is work available in the economy that the claimant can perform.'" *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 785 (6th Cir. 2009) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)).

A court reviewing a denial of Social Security benefits must only determine whether the ALJ's findings were supported by substantial evidence and whether the correct legal standards were applied. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is such relevant evidence as reasonable minds might accept as sufficient to support

the conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). The Commissioner's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g).

### IV.    Analysis

#### A.    The ALJ's Consideration of Opinion Evidence

Jacobi challenges the ALJ's reliance on the opinion of consulting source Dr. Saranga who did not have the opportunity to review Dr. Cole's treatment notes after September 2013. It well-established that, in certain instances, opinions from State agency medical sources may be entitled to greater weight than those of treating or examining sources. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (citing SSR 96–6p, 1996 WL 374180, at *3 (July 2, 1996)). However, when a consultant's opinion is based on an incomplete case record, the ALJ must give an indication that he or she considered the fact that the source did not have the opportunity to review the entire record. *Id.*

The ALJ did not err in his assessment of the opinion evidence. In stating that he gave great weight to Dr. Saranga's opinion, the ALJ noted that Saranga had reviewed the "available medical evidence in September 2013." [Tr. 71] The ALJ also discussed Dr. Cole's treatment notes at length, as well as the dates of treatment, which extended through September 2014. It is clear that the ALJ made a reasoned decision to afford great weight to Dr. Saranga's opinion, despite his inability to review all of Dr. Cole's treatment notes.

Cole did not provide objective testing or other examination results, as discussed in the ALJ's opinion. Her notes consisted mainly of the claimant's subjective complaints and information regarding the claimant's medications. [Tr. 71] The claimant's other treating physician, Dr. Angel, did not provide an opinion at all. *Id.* And while Dr. Nold's physical

examination provided objective information regarding the claimant's capabilities, Nold's opinion regarding work limitations was very limited. In short, Saranga's opinion was reliable and useful, and the ALJ was able to consider Cole's treatment notes and opinion separately.

Ultimately, the ALJ assigned no weight to Cole's opinion that Jacobi would miss two days of work per month related to her symptoms. [Tr. 71] He reasoned that the opinion appeared to be based on the claimant's subjective report that she previously missed two days of work per week. *Id.* The opinion was not supported by any objective testing or any type of examination, other than Cole's statement that Jacobi could not straighten her knee completely. [Tr. 703] The ALJ acknowledged that Cole had treated Jacobi several times but, for the stated reasons, the opinion was not given any weight. Because good reasons were provided for the weight given to Dr. Cole's opinion, the ALJ did not err. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527.

### B. The ALJ's Consideration of Arthritis

Jacobi contends that the ALJ did not properly consider her diagnosis of arthritis at step two of the sequential evaluation, and throughout the remainder of the opinion. [Record No. 10–1, p. 5] While the ALJ determined that the claimant's fibromyalgia was severe, he found that her arthritis was not. [Tr. 66]

Establishing a severe impairment at step two is a *de minimis* hurdle and is intended to screen out totally meritless claims. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1998). An impairment is not severe "only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* However, upon the finding of at least one severe impairment, the ALJ must go on to consider the limitations imposed by *all* impairments.

*See Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007). Accordingly, the failure to characterize osteoarthritis as a severe impairment is of little consequence. Rather, the relevant inquiry is whether *all* impairments were considered in determining the claimant's RFC. *Id.*

The ALJ discussed the claimant's complaints of left knee pain, as well the claimant's reported inability to straighten her knee completely in December 2014. [Tr. 66] However, this appears in the "problem story" of Dr. Cole's treatment note, and there is no indication that Cole performed any objective testing concerning Jacobi's knee. [Tr. 703] The claimant achieved improvement with medication, refused an injection, and deferred an orthopedic evaluation. *Id.* It does not appear that she ever received further intervention for her knee problems. And, as the ALJ noted, only mild osteoarthrosis was observed on an x-ray. [Tr. 66]

The claimant argues that the ALJ failed to incorporate the limitations resulting from her arthritis at step four, but she does not identify the nature of those limitations. [*See* Record No. 10–1, p. 5–6] While Dr. Cole offered a conclusory opinion that Jacobi would have a high rate of absenteeism from work, neither Dr. Cole nor any other source opined regarding functional limitations caused by arthritis. Although fibromyalgia is not a form of arthritis, it impairs the joints and/or soft tissues and causes chronic, diffuse pain. *See Eastin v. Reliance Std. Life Ins. Co.*, No. 2: 12-cv-140, 2013 WL 4648736, at *2 (E.D. Ky. Aug. 23, 2013). The claimant has not established that her arthritis caused any impairments beyond those caused by fibromyalgia, which the ALJ discussed extensively in his opinion. Further, Jacobi has not explained how she believes her RFC should be further restricted to account for the alleged limitations caused by arthritis. Accordingly, the ALJ did not err with respect to his consideration of the claimant's arthritis.

### C. Full and Fair Hearing

The claimant contends that she was deprived a full and fair hearing because the ALJ assigned to this case "seemed to be on 'auto pilot' at times," made a confusing statement and, on three occasions, stopped and stared "for an awkward amount of time." [Record No. 10–1, p. 1] However, she does not claim that the alleged conduct prevented the ALJ from fully evaluating the evidence. Based on the hearing transcript and the thorough discussion of the evidence included in the ALJ's opinion, it is clear that he examined the record thoroughly. The claimant has failed to identify any prejudice she might have suffered, and she has presented this argument in a general and superficial manner. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ([I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argument are deemed waived.") Accordingly, Jacobi has failed to demonstrate that the ALJ's alleged conduct is a basis for reversing the Commissioner's decision.

Based on the foregoing, it is hereby

**ORDERED** as follows:

1. Defendant Nancy A. Berryhill's Motion for Summary Judgment [Record No. 12] is **GRANTED**.

2. Plaintiff Jennifer Gayle Jacobi's Motion for Summary Judgment [Record No. 10] is **DENIED.**

3. The administrative decision will be **AFFIRMED** by separate Judgment entered this date.

This 10th day of April, 2017.



Signed By:
*Danny C. Reeves* DCR
United States District Judge

- 14 -